UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL CALLAWAY, | ) | Case No.  1:08 CV 1710 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge James S. Gallas |
| | ) | |

Paul Callaway was given a medical discharge from the U.S. Army on May 16, 1997 where he had served since July 1982 in the capacities as aircraft refueler, parachutist in the Special Forces and medic. The Veteran's Administration [VA] certified on January 14, 2004, that Callaway was permanently and totally disabled due to migraine headache, uveal inflamation, [1] dysthymic disorder, and invertebral disc syndrome (Tr. 104). He had been receiving 100% disability from the Veterans' Administration since July 27, 1998 (Tr. 105-06).

On February 3, 1999 he applied for disability insurance benefits through the Social Security Administration (Tr. 55). He pursued his administrative remedies but was denied benefits following review by an ALJ for the Social Security Administration on September 19, 2000 (Tr. 44-55). In that decision the ALJ found severe impairment due to bilateral uveitis with blindness in the left eye, status post glaucoma, migraine headaches, and degenerative changes in the lumbar spine (Tr. 50). However, no severe mental restrictions were found and the ALJ determined that Callaway was not

---

[1] **Uveitis** - an inflammation of part or all of the uvea, the middle (vascular) tunic of the eye, and commonly involving the other tunics (the sclera and cornea and retina). *Dorland's Illustrated Medical Dictionary*, p. 1785 (28th Ed.)

1:08 CV 1710                                        2

disabled because he could perform other work as a cashier, surveillance system monitor, or food preparation worker (Tr. 55).

Callaway did not appeal, but instead reapplied for disability insurance benefits on January 28, 2003 and January 15, 2004 (Tr. 31). These applications were consolidated for review by an ALJ, who on February 15, 2007 denied benefits (Tr. 18-31). The ALJ found that Callaway had no severe mental impairment and that due to his physical impairments he nonetheless could perform in such occupations as sales attendant, or housekeeping-cleaner based on testimony from a vocational expert.

Callaway filed this appeal seeking judicial reversal under 42 U.S.C. §405(g) from the administrative denial of disability insurance benefits.  At issue is the ALJ's decision dated February 15, 2007, which stands as the final decision of the Commissioner.  See 20 C.F.R. §404.1481.  The parties consented to the jurisdiction of the Magistrate Judge for all further proceedings including entry of judgment in accordance with 28 U.S.C. §636(c) and Rule 73 of the Federal Rules of Civil Procedure.

Callaway is a younger individual who was 40 years of age on December 31, 2003 when his insured status for disability insurance benefits expired.  "In order to establish entitlement to disability insurance benefits, [Callaway] must establish that he became 'disabled' prior to the expiration of his insured status period." *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990); *Higgs v. Bowen*, 880 F.2d 860, 861 (6th Cir. 1988); 42 U.S.C. §423(a) and (c). Also due to the effect of administrative *res judicata* from the prior denial of disability insurance benefits, Callaway's earliest onset date is

1:08 CV 1710                                           3

September 20, 2000. See 42 U.S.C. §405(h); *Wilson v. Califano*, 580 F.2d 208, 211 (6th Cir. 1978);

*Wills v. Secretary, Health and Hum. Servs*., 802 F.2d 870, 871 & notes (6th Cir. 1986). He obtained

veterans' benefits based in part on a diagnosis of  dysthymia (Tr. 104).  He also claims that he

suffered from post traumatic stress disorder. However, no VA treatment record confirms this. (Tr.

432). Callaway, though, now focuses his arguments on the findings of Dr. Deckert, Dr. Stoudmire,

Nurse practitioner Anne Rusterholtz, Dr. Leventhal ( a consultative examiner for the state agency),

in his contention that the Commissioner's determination that Callaway did not suffer from a severe

mental impairment through his date last insured is not supported by substantial evidence. His

secondary argument is that the additional restrictions to routine work with only superficial interaction

with others due to his mental impairment is disabling based on the testimony of the vocational expert

from the administrative hearing. (Tr. 750-52). Callaway's arguments do not contest the finding that

his physical capabilities allow for a reduced range of light work with a sit/stand option, and not

requiring binocular vision, detailed work, work in unprotected heights, around dangerous machinery

or requiring commercial driving. (Tr. 26, 29).


*Standard of Review:*

        The issues before this court must be resolved under the standard whether there is substantial

evidence in the record to support the Commissioner's decision.  Substantial evidence is evidence that

a reasonable mind would accept as adequate to support the challenged conclusion.  *Casey v.

Secretary of Health & Human Services*,  987 F.2d 1230, 1233 (6th Cir. 1993);  *Wyatt v. Secretary*,

974 F.2d 680, 683 (6th Cir. 1992); *Born v. Secretary*, 923 F.2d 1168, 1173 (6th Cir. 1990); and see

1:08 CV 1710                                         4

*Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (court may "not inquire whether the record could support a decision the other way").

*Sequential Evaluation and Meeting or Equaling the Listing of Impairments:*

        The Commissioner follows a 5-step review process known as the sequential evaluation. This evaluation begins with the question whether the claimant is engaged in substantial gainful activity and then at the second step whether there is a medically severe impairment. See §404.1520(a)(4)(i) and (ii) and §416.920(a)(4)(i) & (ii). At the third step of a disability evaluation sequence the issue is whether the claimant has an impairment which meets or equals a listed impairment from the Listing of Impairments of Appendix 1. See 20 C.F.R. §404.1520(a)(iii) and (d); §416.920(a)(iii) and (d). If an impairment exists which meets the description from the listing or is its equivalent, the claimant is deemed disabled at that point without consideration of age, education or prior work experience. See *Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (Once a claimant has met this burden that ". . . his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without determination whether he can perform his prior work or other work.")."At the fourth step of the sequential approach described in 20 C.F.R. §404.1520, it is the claimant's burden to show that [he] is unable to perform her previous type of work." *Dykes ex rel. Brymer v. Barnhart*, 112 Fed. Appx. 463, 467, 2004 WL 2297874, at *3 (6th Cir. 2004)); *Studaway v. Sect'y of Health and Human Services*, 815 F.2d 1074, 1076 (6th Cir. 1987). Once the administrative decision-maker determines that an individual cannot perform past relevant

1:08 CV 1710                                    5

work, then the burden of going forward shifts to the Commissioner at the fifth step to demonstrate

the existence of types of employment compatible with the individual's disability. *Allen v. Califano*,

613 F.2d 139 (6th Cir. 1980); *Cole v. Secretary*, 820 F.2d 768, 771 (6th Cir. 1987); *Abbott v.*

*Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th

Cir. 1999).


*Evaluation of opinion from the treating physician:*

In determining the question of substantiality of the evidence, reports of physicians who have

provided treatment over a long period of time are entitled to greater weight than the reports of

physicians employed by the government for the purpose of defending against a claim for disability.

See 20 C.F.R. §404.1527(d)(2); §416.927(d)(2).; 20 C.F.R. §404.1527(d)(3); §416.927(d)(3). This

is commonly known as the "treating physician rule." See *Rogers v. Commissioner of Soc. Sec.*, 486

F.3d 234, 242 (6th Cir. 2007); *Wilson* v. *Commissioner of Soc. Sec.*, 378 F.3d 541, 544(6th Cir. 2004).

The ALJ must give the opinion from the treating source controlling weight if he finds the opinion

"well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not

inconsistent with the other substantial evidence in [the] case record." *Wilson v. Commissioner,*  378

F.3d 541, 544 (6th Cir. 2004) quoting 20 C.F.R. §404.1527(d)(2) and §416.927(d)(2).


Dr. Levine at the Cleveland VA hospital reported that on September 23, 1999, Callaway had

been court-referred for consultative evaluation after cashing stolen business checks in March 1998

for the amount of $10,000 (Tr. 575). Callaway had also attacked another prisoner (Tr. 577). This

psychiatrist related that Callaway had served 2 months and was now on probation with counseling

1:08 CV 1710                                6

required. Callaway reported that he stayed up for days at a time, did not leave his home, cut off the

telephone, could not watch TV,  felt angry and agitated, and had blackouts where he got into fights.

(Tr. 575). He also reported difficulty with memory (Tr. 576), and was somewhat "guarded." *Id.*  Dr.

Levine diagnosed dysthymic disorder and ruled out personality disorder (Tr. 577). Dr. Levine

believed that  Callaway was at low risk for danger to self , but moderate risk for danger to others. *Id.*

He believed that there was paranoid ideation, but Callaway was not delusional, and he assigned a

global assessment of functioning score [ GAF] of 35, indicating major mental impairment. *Id.* [2]

    Nurse Rusterholtz from the Cleveland  VA Hospital reported in August 2002 that Callaway

admitted to alcohol use socially and marijuana use in the past to alleviate his uveitis pain (Tr. 514-

15). The depression screen was negative as Callaway denied feeling "down" or hopeless (Tr. 516).

The post traumatic screen was also negative. *Id.* Callaway reported never having terrible experiences,

not being bothered by memories of stressful events, not feeling distant or cut off from others, or

feeling "super alert" watchful or "on guard" in the past month. *Id.*

---

    [2] A GAF score of 31 to 40 is described as indicating: "**Some impairment in reality testing or communication** (*e.g.* speech is at time illogical, obscure, or irrelevant) **OR major impairment is several areas, such as work or school, family relations, judgment, thinking or mood** (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, p. 34 (4th Ed. text revision).

    The GAF score "represents 'the clinician's judgment of the individual's overall level of functioning,'" not necessarily the severity of impairment.  *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed.Appx. 411, 415, 2006 WL 3690637 (6th Cir. Dec. 15, 2006); *Wesley v. Comm'r of Soc. Sec.*, 2000 WL 191664, at *3 (6th Cir. Feb. 11, 2000) (quoting Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed.1994)). For example, a GAF score in the 41to 50 range may reflect either the clinician's opinion that the claimant has "serious symptoms" **or** "serious impairment" of social or occupational functioning. *Kornecky v. Comm'r of Social Security,* 167 Fed.Appx. 496, 511, 2006 WL 305648, 110 Soc. Sec. Rep. Serv. 315 (6th Cir.  Feb. 9, 2006). The score itself  "does not establish an impairment seriously interfering with the plaintiff's ability to perform basic work activities." *Id.*, (quoting *Quaite v. Barnhart*, 312 F. Supp. 2d 1195, 1200 (E.D. Mo. 2004)). Further the ALJ's failure to refer to a GAF score in formulating residual functional capacity does not make this formulation unreliable. *Kornecky*, 167 Fed. Appx. at 511; *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 469 (6th Cir. 2003).  The Commissioner has determined that there is no direct correlation between GAF scores measurements and the mental disorder severity listings.   65 Fed. Reg. 50746-01, 5076-4, 5076-5, 2000 WL 1173632 (F. R.); *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 415 (6th Cir. 2006)(unpublished). Consequently, the GAF score does not reflect a judgment on the severity of the mental impairment *vis-à-vis* the listed impairments.

1:08 CV 1710                                    7

During 2003 Callaway was in prison for misuse of a credit card and parole violations (Tr. 501).While in prison Callaway was prescribed lithium (Tr. 348). He was examined by psychiatrist Dr. Deckert, who in August 2003 reported that Callaway stated that he had had flashbacks for many years and nightmares about his military service. (Tr. 348). He also claimed that he had been diagnosed with post traumatic stress syndrome and that was the reason for his retirement. (Tr. 348-49).  Callaway reported that he last used cannabis in March 2003 before serving his prison sentence. *Id*. On examination, Callaway was alert, fully-oriented, and well groomed, but slightly irritable with variable affect. (Tr. 349). Speech and thoughts were normal and there were no delusions, no hallucinations, and no suicidal or homicidal ideation. *Id.* Attention, concentration and memory were intact and insight was fair with judgment intact. (Tr. 350). Dr. Deckert diagnosed dysthymia with history of post traumatic stress syndrome, discontinued lithium, and assigned a GAF score of 50, indicating serious to moderate symptoms. See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, p. 34 (4th Ed. text revision).

Dr. Russo a prison psychologist reported that Callaway attended mental health education group on October 23, 2003 (Tr. 329). Dr. Eisel, also at the prison, reported that Callaway had requested being placed in a post traumatic stress disorder group. (Tr. 329). Callaway was carrying a cane, but not using it (Tr. 330).  Mood was euthymic, [3] affect appropriate, no psychomotor agitation or retardation, no signs of mental illness, and his only symptom was prior VA treatment of post

_____

[3] "**Euthymic** is a medical term referring to a joyful or tranquil mood, neither manic nor depressed." *Sultan v. Barnhart,* 368 F.3d 857, 861 (8th Cir. 2004).

1:08 CV 1710                                      8

traumatic stress disorder. *Id.* Dr. Eisel refused to diagnose mental illness and stated that there would be no follow-up unless Callaway reported an increase in symptoms.

Following his December 2003 release from prison, he began receiving psychiatric treatment through the VA from Dr. Stoudmire on January 6, 2004 (Tr. 500).  Dr. Stoudmire  ruled out post traumatic stress disorder and bipolar disorder but assessed dysthymia (by history). *Id.* Callaway reported that he had recurrent nightmares, poor sleep, frequent flashbacks of combat. Dr. Stoudmire reported that mood was euthymic,  affect was with full range, thoughts were well-organized, and there was no evidence of delusions, but there was mild paranoia toward police (Tr. 500).

Dr. Stoudmire examined Callaway for a second time on February 17, 2004 and reported mood improvement, decrease in nightmares and flashbacks and that he was sleeping well with Trazodone (Tr. 487). There was no evidence of delusions, paranoia, hallucinations, mood was euthymic, thoughts were well-organized, speech was normal and judgment and insight were intact. *Id.* Concomitant with this examination, Dr. Stoudmire prepared a mental residual functional capacity assessment indicating only "fair" ability to follow work rules, and "poor" abilities for use of judgment, maintain attention, respond appropriately to changes in work routine, maintain attendance, or in dealing with others (Tr. 316). As for functioning, there was only "fair" ability to remember and carry out simple or complex job instruction, but "poor" ability to remember and carry out detailed but not complex job instruction. *Id.* As for social functioning, Callaway's abilities were "fair" except for "poor" ability to manage funds and schedules. *Id.*

1:08 CV 1710                                    9

    Dr. Stoudmire referred Callaway to the Center for Stress Recovery in March 2004(Tr. 484). Psychological assessment was cannabis dependence reportedly in full remission, cocaine abuse by history, alcohol abuse by history, dysthymia by history and narcissistic and anti-social traits (Tr. 483). The assessment noted that Callaway had been recently released from prison and had marital conflict as his stressors. *Id.* At the time his GAF score was 55, indicating moderate symptoms. See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, p. 34 (4th Ed. text revision). Callaway had described a "tenuous" relationship with his wife, but also related that his greatest strength was his ability to adapt to any situation and his fault was being "too nice." (Tr. 484). Callaway's medical history indicated dysthymic disorder, and it was noted that the prior finding that Callaway was a danger because of post traumatic stress syndrome was not verified by the records. Callaway did not keep his March 4, 2004 appointment for psychological testing, and he failed to submit a urine sample. (Tr. 486). Assessment from interview refuted post traumatic stress syndrome and interview was inconsistent with the medical records and other data sources. (Tr. 486). Callaway claimed that he was on the front line in Desert Storm when he decided to "go and cover the 6" and his replacement was shot and died in his arms. *Id.* Callaway was not accepted into the Center for Stress Recovery.

    On April 23, 2004, Callaway requested psychiatric admission to the VA Hospital.(Tr. 481-82). He claimed to be suicidal, his medications were not working, and that he had many weapons and wanted to harm people. (Tr. 480). It was noted that although Callaway claimed to be compliant with medication, his prescriptions had not been refilled since January 6, 2004. (Tr. 480). He was admitted for the protection of self and others.

1:08 CV 1710                                    10

Once admitted, Callaway protested and claimed to be "joking around." (Tr. 354). He said that he only came to get his Trazodone,  that he was working in a supervisory position for a janitorial company, and that he needed to get back to work or he would lose his job. *Id.*  Dr. Marqua reported that Callaway described his mood as 8/10, 10 being the best, denied depression, claimed he had good energy, some insomnia for which he was taking Trazodone, no psychotic episodes, had only smoked two joint of cannabis, and denied keeping weapons in his house. (Tr. 354). Examination revealed normal speech, full affect, coherent and organized thoughts, no delusions, no hallucinations, and intact attention and concentration. *Id.* Dr. Marqua diagnosed dysthymic disorder and cannabis abuse and assigned as a stressor Callaway's dying mother. The doctor found a GAF of 75, indicating transient and expectable reaction to psychological stressors. (Tr. 354); See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, p. 34 (4th Ed. text revision). Dr. Marqua commented that Callaway was competent and employable (Tr. 355).


On July 8, 2004, Callaway was consultatively examined on behalf of the state agency by Dr. Leventhal (Tr. 413-19).  This psychiatrist diagnosed major depressive disorder, with psychotic features and paranoid personality disorder (Tr. 418). The assigned GAF score was 38 indicating major impairment in several areas. *Id.* In assessing work-related capabilities, Dr. Leventhal concluded that Callaway had *extremely* impaired ability to relate to others due to mistrust and aggressive manner, *markedly* impaired ability to understand, remember and follow instructions, *markedly* impaired ability to maintain attention and concentration, and *markedly* impaired ability to withstand work stress and pressure. (Tr. 419).

1:08 CV 1710                                        11

The medical record were reviewed by state agency psychologist Dr. Casterline in August 2004, who found that the VA records did not indicate post traumatic stress syndrome despite Callaway's claims, that there were numerous inconsistencies in Callaway's self-reports. He refused to give a urine sample and reported that his medication caused him to have difficulty urinating, yet his medication did no have that side-effect; he was considered to be malingering in his visual exam at the VA; he reported auditory hallucinations to Dr. Leventhal (Tr. 416) yet this has not been reported elsewhere; he was noted to be evasive and having difficulty reporting consistent symptoms; and a 3rd party was contacted and unable to describe any significant limitations. (Tr. 432). Dr. Casterline found that the evidence was insufficient for medical disposition. (Tr. 420).

Another state agency psychologist Dr. Williams reviewed the record and found no severe mental impairment in her January 2005 review for the period running from May 1, 1997 to December 31, 2003 (Tr. 583). This psychologist considered Callaway's affective disorders and substance addiction disorders and concluded that at worst these had only "mild" limitation on social functioning and maintaining concentration, persistence or pace. (Tr. 593). Dr. Williams remarked that following the incident where Callaway threatened to harm others, Callaway "back-peddled" immediately and voiced concern about missing work, and was released the next day with employability rating by VA of "return to work." (Tr. 595). Also, Callaway claimed he suffers post traumatic stress syndrome, but VA records show that he was considered ill-suited for Center for Stress Recovery services and prison record show Callaway participating adequately and unremarkably in group services. *Id.* Finally, criminal records reflected "resource generating activity" and not a pattern of severe or substantial mental functional incapacity. (Tr. 595).

1:08 CV 1710                                   12

Prior to Dr. Williams' review, Dr. Pawlarczyk reviewed the medical record in May 2003 for the period commencing May 1, 1997 to the present (Tr. 244-257).This psychologist provided less explanation, but he found additional "mild" limitation in activities of daily living (Tr. 255). Dr. Pawlarczyk found some symptoms of depression and cannabis abuse, but that Callaway can perform minimal activities within his physical capabilities. This psychologist found no severe impairment. (Tr. 257).


*The Commissioner's Determination:*

The Commissioner's determination opted to give weight to the mental residual functional capacity assessments from Dr. Pawlarczyk and Dr. Williams. (See Tr. 25). Callaway complains that the findings of examining physician, Dr. Deckert, and treating physician, Dr. Stoudmire, were erroneously dismissed, as well as the consultative evaluation by Dr. Leventhal.  Generally, medical sources who have examined the claimant are entitled to more weight. See 20 C.F. R. §404.1527(d)(1); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). [4] The ALJ's analysis shows that

---

[4]    Neither of the reports from the non-examining psychologists refers to a report from a specialist. So, the Commissioner's rejection of the opinions from examining medical sources was not grounded on SSR 96-6p. As noted in *Rogers v. Commissioner of Social Security*:

> The importance of a non-examining source having a complete medical snapshot when reviewing a claimant's file was emphasized in a 1996 Ruling of the Social Security Administration: In appropriate circumstances, opinions from State agency medical and psychological consultants ... may be entitled to greater weight than the opinions of treating or examining sources ... if the State agency medical ... consultant's opinion is based on a *review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.*

> Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996), Policy Interpretation Ruling Titles II and XVI: Consideration of Administrative Findings of Fact by a State Agency Medical or Psychological Consultants and other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Level of Administrative Review; Medical Equivalence. (emphasis supplied).

> *Rogers v. Commissioner of Social Sec.,* 486 F.3d 234, 245 n.4 (6th Cir. 2007).

1:08 CV 1710                                13

the determination was not simply a matter of acceptance of the mental residual functional capacities from the state agency physicians. The ALJ's evaluation included the contrasting findings from examining psychiatrists from the VA hospital.

Dr. Stoudmire at the VA hospital was arguably a treating physician. His report was acknowledged as indicating the conclusion that Callaway was disabled, but his opinion and Dr. Leventhal's were rejected as lacking any probative weight and inconsistent with the longitudinal record. (Tr. 22). The regulation does not refer to "probative weight" but does factor in supportability. See 20 C.F.R. §404.1527(d)(3).  Supportability takes into account medical evidence *and explanation*. [5] Consistency is "the more consistent an opinion is with the record as a whole, the more weight we give that opinion." See 20 C.F.R. §§404.1527(d)(4).

The ALJ found that Dr. Stoudmire's conclusions were not supported and inconsistent with the evidence that doctor had reported, as follows:

> claimant was alert and oriented. He had good eye contact. Claimant was well groomed and casually dress. he had normal speech, euthymic mood and his affect was full range. His thoughts were well organized and he denied hallucinations, suicidal or homicidal ideations. There was no evidence of delusions. He had only mild paranoia towards the police since his release form prison, but his judgment and insight appeared to be intact. (Tr. 23, 500).

This determination was supported by substantial evidence. Dr. Stoudmire's residual functional capacity reflected conclusions which were tantamount to disability but  were internally

---

[5] "The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(d)(3).

1:08 CV 1710                                    14

inconsistent with his psychiatric findings of normalcy. It ultimately lacked supportability based on that psychiatrist's own findings.

The ALJ also scrutinized Dr. Leventhal's report and essentially concluded that Callaway was malingering, or as the ALJ stated "reflecting an impairment in motivation more so than actual impairment." (Tr. 23). The ALJ noted that the doctor reported on Callaway's lack of knowledge on matters pertaining to the year, location of the office and the nature of the office setting. (Tr. 23, 416). Dr. Leventhal commented that these were seen as reflecting a significant degree of impaired motivation and Callaway was believed to be actually adequately oriented to time, place and person. (Tr. 416). The ALJ also noted Dr. Leventhal's comment about the poor performance on short-term memory and concentration tasks which reflected motivation primarily, rather than any significant intrinsic impairment in short-term memory or actual impairment in concentration. (Tr. 23, 417). Finally, the ALJ contrasted the doctor's July 2004 report to Callaway's April 2004 antics which resulted in a brief detention for observation when Callaway threatened harm to himself and others but later claimed he was "joking." (Tr. 24). His GAF according to Dr. Marqua at that time was 75, yet Dr. Leventhal scored it as 38 in July 2004. (Tr. 24, 354, 418).  Also, the ALJ contrasted Dr. Leventhal's findings to VA hospital medical records from that period of 2004 which included references to full range of affect, and full orientation . (Tr. 24,464). VA psychiatrist Dr. Medarametla and Dr. Leventhal both diagnosed major depressive disorder (TR. 418,464),  yet Dr. Medarametla scored Callaway's condition also at a GAF of 75, whereas Dr. Leventhal gave it a 38. (Tr. 24, 418, 464). Dr. Medarametla  also was an examining physician. Accordingly, although Dr. Leventhal himself did not conclude that Callaway was a malingerer, that doctor's comments combined with

1:08 CV 1710                                        15

contemporaneous medical reports from other examining physicians provided substantial evidence

to support this conclusion.


Obviously, there was inconsistency between the reports from examining psychiatrists from

the VA hospital and Dr. Leventhal. The ALJ did not simply defer to the opinions from non-

examining state agency physicians. That contradictory medical evidence plus Dr. Leventhal's own

comments over the lack of motivation provided substantial evidence for rejection of those

conclusions. From this record the Commissioner could reasonably conclude that Callaway was

feigning or at least exaggerating his degree of  mental illness. See *Zargi v. Commissioner of Social*

*Sec.,*  2009 WL 1505311, at * 19 (E.D.Cal.); *Markarian v. Sect'y of Health and Hum. Servs*.,1992

WL 99339, 962 F.2d  14 (Table 9th Cir. May 11, 1992); But see *Pratt v. Sullivan*, 956 F.2d 830, 834

(8th Cir. 1992)(ALJ cannot substitute lay opinion for that of examining and treating physicians).


Following the ALJ's first tier of  review in rejecting the opinions favoring disability, the ALJ

further had substantial evidence supporting the determination at the second tier in finding that

Callaway's mental impairment was   non-severe. See 20 C.F. R. §404.1520a(e)(2). Section

404.1520a(c)(4) explains that using the Psychiatric Review Technique (PRT) ratings, ratings of none

or mild in the first three functional areas and none in the last functional area indicate non-severe

impairment.  In all other instances, the ALJ must assess whether a "severe" mental impairment meets

or equals a listed impairment, and then, if not, assess residual functional capacity and the ability to

perform substantial gainful activity. See §404.1520a(d)(2)&(3). Dr. Pawlarczyk's and Dr. William's

1:08 CV 1710                                      16

psychiatric technique determinations were consistent with the conclusion of non-severe mental impairment during the period that Callaway was eligible for disability insurance benefits.

*Vocational Expert's Testimony:*

Callaway's second argument is based on the presumption that the Commissioner's rejection of Dr. Stoudmire's assessment was erroneous. Callaway had asked the vocational expert to consider restriction to routine work with superficial interaction with others. (Tr. 749). With these mental restrictions the expert testified that Callaway was unemployable (Tr. 751-52).

A vocational expert's opinion cannot constitute substantial evidence unless the expert <u>precisely</u> considers the particular physical and mental impairments affecting claimant. *Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987); *McMillan v. Schweiker*, 697 F.2d 215, 221 (8th Cir. 1983). *Howard v. Commissioner*, 276 F.3d 235, 239 (6th Cir. 2002). The ALJ is not required to propound a hypothetical question accepting all claimant's allegations as credible. *Varley*, 820 F.2d at 780. Rather, the hypothetical question must be based upon factual assumptions supported by substantial evidence from the record. *Id*. "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1235 (6th Cir.1993).

The ALJ had substantial evidence to support the  residual functional capacity assessments from the non-examining state agency physicians and examining physicians to support the conclusion

1:08 CV 1710                                            17

that Callaway's mental impairment was non-severe. As a result the vocational expert's response to the ALJ's own hypothetical question provided substantial evidence for the vocational decision. See *Hardaway v. Secretary of Health and Human Services,* 823 F.2d 922, 928 (6th Cir.1987). Although there may be alternative hypothetical questions, as long as the one selected by the ALJ was supported by substantial evidence in the record, it passes judicial scrutiny.


### *CONCLUSION*

The issues before this court must be resolved under the standard of whether the determination is supported by substantial evidence of record.   "Under 42 U.S.C. §405(g), the ALJ's findings are conclusive as long as they are supported by substantial evidence." *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 851 (6th Cir. 1986) (stating that this court's review "is limited to determining whether there is substantial evidence in the record to support the findings")."   *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).   Based on the arguments presented, the record in this matter and the applicable law, the Commissioner's determination denying disability insurance benefits is supported by substantial evidence, and is affirmed.


                                    s/James S. Gallas
                            United States Magistrate Judge


July 23, 2009